The first case this morning is number 2011-1011, Marshall Patent against U.S. South, Mr. Massa. May it please the Court, this is a complicated appeal but it can be simplified for purposes of this morning because if Appellant Marvin Marshall loses its position that the geographic impossibility or what we call the GI test is not a part of the claim, we lose the appeal. So I'd like to focus on that and before I focus right on the GI test, I just want to give a brief background. Technology involves a system that interacts with a conventional switch. I think we're pretty good on the background, you probably want to jump to your argument. Great. Thank you. On the GI test, the district court made the proper legal determination that for this algorithmic step, what is the structure that is capable of performing the recited function? At A6, the court cited default, proved 4-12, fed third at 1298. We agree that's the proper legal standard. Is the structure capable of performing the recited function? But it's a low bar. As this court said in Bio Medino, 490 fed third at 950, exhaustive structure is not required. While the specification must contain structure linked to the claim means, this is not a high bar. All one needs to do in order to obtain the benefit of section 112 paragraph 6 is to recite some structure corresponding to the means in the specification. Assume that we're familiar with the law and tell us how Mr. Marshall's invention complies. The district court repeatedly found that there was sufficient structure in the algorithmic steps to perform the recited functions. At A11, it found it generally provides extensive, specific information that is not merely a classification of the claim functions. It wasn't a close case in terms of whether the claim was definite or not for the SCM, the switching computer means algorithm. What the issue becomes was the district court correct in requiring the GI test? And as to that, I think the important thing to recognize is that the summary of the invention repeatedly states that it teaches against using every anti-fraud test that's disclosed in the specification. Rather, it says you can customize your system. That's at column 3, lines 44 to 46, 8072, to monitor any number of parameters. Can you just walk me through for a minute, where is the structure in the spec? What is the best place, you think, in terms of line and column number, that corresponds to the switching computer means capable of processing the call data? Sure. Your Honor, at A... No, in column and line number in the patent, please. At A445... I just have the patent. So, column 2, line something, or what? What I'm trying to explain is that at A445, there's 15 algorithmic steps in the SCM algorithm, and the column and line number for each step is recited.  I want you to tell me where is the structure that corresponds to the switching computer means, and then, of course, there has to be an algorithm that explains how that structure will operate in some cases. Okay. So, I'm wondering where the structure is. Okay. If Your Honor looks at A70, the figure on the 636 patent... 636 figure, and in particular, box 16, it says switching station. Is that where you're going to direct me? That's correct, Your Honor. And within the switching station, there's, of course, a switch that includes a switch processor 18, and it's the switch processor's interaction with the PCs, which are labeled 32 and 33, that's where the telephony switch data is captured by the system and shunts that information to the issuer's PCs. So, just so I understand clearly, is the structure that constitutes the disclosed structure for the switching computer means, is it the entire box, everything in number 16? Is it only some subset of that, which is the switch processor in combination with the two personal computers? What exactly is the structure that corresponds to this mean? It's the subset of the box 16, Your Honor. It's that switch processor, 18, and you'll see there's some lines, data capture lines, 61, 62, that interact with those personal computers, 32. That is the switching computer means. Okay, what is the switching computer means? The processor? The processor. No. Okay, I'm sorry. The processor, and you have to also include the data transmission points, so it would 61, 62, and then into the PCs 32, 33, because it captures the data and then it relays it to the personal computers. I'm just wondering where there is a disclosure of which portions, I mean, you know, we can't just cherry pick from a figure. Okay, take this box, this box, and this box, unassociated and ill-defined, and those constitute the structure. So I'm wondering, you know, how I am supposed to discern that what the patentee believes is the disclosed structure under 112.6 is the processor in conjunction with the two computer means from this figure. I mean, if you had said the whole box, maybe it would have made a little more sense, but to cherry pick only portions of what's in the box makes it more difficult for me to understand that this is clearly the structure that corresponds to the means. That's a good question, but the claim drives what you're doing. The claim says it's a switching station, including a switch processor, and this is claim one, and a switching computer means capable of processing the call data. So when it comes into the switch processor, it shunts that information, the PCs, and the switch processor process that call data. So it's those two things in conjunction that tells a person of ordinary skill. This is the structure that we're referring to within that box 16. So there's repeated statements in the summary that say, you can pick a number of anti-fraud tests. Okay? It says throughout, this is, the way this got, let me take a step back for a second. The way this got around the priority is there were two things. One is it used, it interacted with a conventional switch, which was different. And two, it did, excuse me, it did it during a pending call. Okay? Those were novel elements of this switching computer means. And there was no hint of any stop or based on a GI test or any particular fraud test other than account balance checking. It's clear from reading the specification and what ordinary skilled people say that accounts balance checking during the pending call. So in other words, you have a travel card, you place the call, it iteratively, it intermittently checks to see if you've reached an account balance.  That's a key part of the invention. It's mentioned throughout the summary, throughout the background, throughout the preferred environment. What's also said during the patent is that any number of fraud tests, other fraud tests, can be exercised. And they would fall, you think, within the scope of the asserted claims? Well, here we have, we're curtailed by the fact that we're dealing with means plus function, and so we have algorithmic steps that have to be filled in. Right, but the question then is, what is the scope of the algorithmic steps with respect to, for example, anti-fraud means that aren't specifically called out? Right. I mean, you have a couple of examples, and then you say, at all, in effect, in the specification. Right. And just to give some flesh to that question, that is an excellent question. The summary of the invention talks about you can do traveling salesman and coast anti-fraud. For example. Right. And then later on, you get to the preferred environment, and now it talks about, for the first time, you can do a GI test or a dual-usage pen test. And so persons of, two people of ordinary skill in the art, Dale Rumpel and John Hendricks, looked at that, and they said, you know, it's clear to us that you have to do account balance checking, but it's also clear to us, from what the spec says, that you can customize or tailor your other anti-fraud tests, depending on what you want, but it's clear that these four are disclosed. What did you say? You have to do account balance checking? That's a non-optional step? That's a non-optional step. All right. But you say that the geographic impossibility is an optional step. It's an optional test. It's an example in the preferred environment, and there's permissive language used in there, as we talked about in our brief, but the point is that the algorithmic step would be one or more of these fraud tests that are not there. Okay, so to be clear, the geographic impossibility is not really optional. There has to be some sort of fraud test, in your opinion. Geographic impossibility is one of the ones that could be chosen. Also, the 900 numbers or the prefix or the area code limitations could alternatively be substituted. I just want to make sure I understand your argument. It's not that you can go with any test or no test at all. The geographic impossibility is one of many options. Is that what you've argued? One of the enunciated options. One of the clearly articulated enunciated options. But you agree the algorithm requires at least one of the options to be adopted? Yes. Yes. One or more persons of ordinary skill would necessarily want to adopt certain. Once they read the patent, they'd want to adopt certain anti-fraud steps. Well, but suppose that all they did was account balance calculation, and they didn't do any anti-fraud. Would they infringe? No. They wouldn't infringe. So you definitely do think there is a requirement that there be an anti-fraud step? Yeah, the patent teaches, for example, that we have to authenticate the PIN. And there's other things that the people of ordinary skill, unrefuted testimony, talk about. I see my meeting into my rebuttal time. We'll save your rebuttal time, Mr. Massey. Thank you. Thank you. Ms. McGrath. May it please the Court. I'm Robin McGrath with Paul Hastings, and I'm here on behalf of the Appellee U.S. South Communications. I'd like to address the geographic impossibility testing and the fact that the district court correctly construed the switching communication, switching computer means limitation to require geographic impossibility testing. And I'd also then like to address why this court should exercise its discretion in finding that Marshall is a stop from challenging the mandatory nature of geographic impossibility testing. The limitation, as you know, appears in all the claims. So you can uphold the finding, as Mr. Mazza noted, of non-infringement on that basis alone. We know that the switching- If I can interrupt for just a second to make sure that we're all on the same page here. With respect to the issue of indefiniteness, the judgment dismissed the counterclaims without prejudice, I believe. So those counterclaims, I take it, are not before us. Is that correct? That's correct. So the- Go ahead. I'm sorry. The court found that certain claims were indefinite. There was no algorithmic steps, and those Marshall has appealed. The court also found, well, the party stipulated to non-infringement based on the construction requiring geographic impossibility. And Judge Moore asked where is the algorithm. I'm sorry. Yeah, but I guess what my follow-up question is, what is the role of the indefiniteness findings of the court with respect to our review, in your view? Well, certain of the claims were found to be indefinite. If the court disagrees with the district court's finding and finds them definite, they're still not infringed because all of those claims, every asserted claim in this case, has the switching computer- Yes. That the indefiniteness issue, if it's in the case at all, it's in the case only as a defense to infringement, correct? It's a defense of invalidity, correct. Right. Okay. And you see the indefiniteness then as being still in the case, notwithstanding the dismissal of the counterclaim. There's been a judgment of invalidity on indefiniteness. No, there hasn't. Well, that's the question that I'm heading towards. Okay, all right. The judgment is a judgment of non-infringement. Non-infringement. Not a judgment of invalidity. You're right. All right. You're right. And what has happened to the, at least the counterclaim articulation of the invalidity, is that that has been taken out of the case. Correct. Not before us. So the only thing, as I understand it, that's before us on invalidity is the question of whether it's available as a defense to infringement. And the question that I have for you is does that put that issue before us, validly before us, as something we should address, either optionally or mandatorily? It's a really interesting question. You know, Marshall has appealed the invalidity finding, which is interesting because, as you noted, that has been, the invalidity defenses have been dismissed. No, no. The counterclaims have been dismissed. The invalidity. The defenses have not been dismissed. You're right. You're right. It's an important distinction. I agree with you. And I guess if you look at indefiniteness as, it was a claim construction issue. So I guess when you look at it that way, you can't infringe a claim that has been found to be indefinite. I've probably taken up more of your time than this issue may warrant. So I have your answer. So thank you. All right. I appreciate it. Now, I want to get back to the geographic impossibility test. Because if you look at columns 6 and 7, the patent walks you through how the switching computer processes the call data, call data being ANI and PIN. And what you'll see is it divides the processing into two separate phases. And in the first phase, you have these PIN validity tests. Those are mandatory. Those are always performed. And there's three of them. It's the traditional PIN validity. Does the system even recognize the PIN? Second, it's the dual usage. Even if it's a valid PIN, is it already in use? If so, you're not going to go forward. And then the third mandatory test is geographic impossibility. And that's where the system determines where and when the last time the PIN was used to see if it's physically possible for the user to travel to the new location to make the call. And the patent specifically distinguishes those PIN validity tests, which always occur, from the customer-programmed fraud tests that are discussed in columns 2 and 6. If you can see that, column 7, line 37, it says, if all of these validity tests are passed, the validity tests being the three I just mentioned, including GI, a signal is then sent to the DCO switch 22 to complete the call if no customer-imposed limitations are in place. Of course, if customer-imposed limitations are present, such as call rerouting and the like, the DCO switch 22 completes the call in accordance with the customer's requirements. These customer-imposed limitations are the things that Mr. Mazza was addressing, disallowing 900 calls or international calls, allowing calls only to or from certain zip codes. So you've got PIN validity checks on the one hand, GI testing included. These happen as a matter of course. And then if there are customer-programmed limitations, those happen after the PIN validity test. Where would you point us to the place in the specification that most clearly, in your view, identifies the PIN validity test, and in particular geographic impossibility, as mandatory? Absolutely. If you look at starting at column 6, line 62, it talks about call validating and processing. Call processing is based upon these three items being any PIN and then the time of origination. And then it goes through. First, PC 32, that's the switching computer, checks to see if the PIN matches a valid PIN. And then it talks about what happens if it doesn't. And then you can go to column 7, line 14. It says if the attempted call passes this preliminary test, it's from an authorized location and the PIN appears to be valid, the novel system takes still further precautions before processing the call. And it goes on. More particularly, the PC 32 checks to see if it's already in use. That's the dual-use test. And then it says, line 22, if the dual-use test is passed, PC 32 then reads its memory to determine when and from where the same caller placed his or her previous call, the time and location, et cetera. Geographic impossibility. Now, I'm sorry. Go ahead. It talks about those three. And then it says if all of these validity tests are passed, not you could do them, you might do them, if they're passed and only if they're passed, then you go on and you complete the call with respect to the customer-imposed limitations, fraud tests. Now, I think Mr. Mazza would say in all likelihood that this all is part of the narrative that begins on column 6, 945, in which a single call is followed. And he would further say, I would assume, that that is merely exemplary. That is an example of how, in a preferred environment, the system works. It isn't intended to describe the only way that the system can be made to work. And your answer to that would be? It's the only place that any kind of algorithm is identified. I mean, we're talking about a means plus function claim with a general-purpose computer, PC 32. Under WMS Gaming and its progeny, you have to have the algorithm for performing the processing call data function. Where I read, starting on column 6, line 63, that's where the steps, the algorithmic steps for processing the call data are set out. It is the only place geographic possibility. The algorithmic steps, I think Mr. Mazza would argue, go to whether, and did argue, go to whether validity tests are passed, as you suggested. And at column 6, as he points out, lines 30 to 44 indicate there are other validity tests, he expressly calls them that, that could be used, his patent does, or his client's patent. So why aren't the items listed at column 6, line 30 through 44 alternatives that are available to be used to act as a validity test in much the same way as the specific disclosure of geographic impossibility? Sure. They are alternatives available. And the patent, what the patent says is after you go through the pin validity test, including geographic impossibility, then you go on to the customer-imposed limitations. It specifically says that at line 35 of column 7. If the validity tests are passed, a signal is sent to complete the call if no customer-imposed limitations are in place. But if those customer limitations are in place, such as call rerouting and the like, those are the fraud tests that are set forth in column 6 in the lines that you've just indicated. So what the customer can do is say, all right, I want to add a whole bunch of other things. I want to make sure my salespeople can't call into territories they're not allowed to call. So once you get toward the basic preliminary test, it's a valid pin, it's a good pin, it passes the pin test, then you go on to the customer-imposed limitations, including examples of which are in column 6 as well as column 2. And so because the patent distinguishes those, I would argue, geographic impossibility, which, by the way, is only mentioned one time in the pin validity section. That has to happen before you go on to the permissible tests. I'd like to just quickly, in my remaining time, explain why I think the court should exercise its discretion in finding that Marshall is a stop from even arguing that geographic impossibility is permissible as opposed to mandatory. I think your time might be more productively spent on the substance of the issues that are before us. Then I will move on to the second issue that I believe the court should address, which is why the district court appropriately construed the switching... Actually, if Presiding Judge doesn't mind, I would have one very quick, discreet, factual question on this issue of the estoppel, if I may. I won't take much time. Did Judge Davis specifically advert to the change in position at any point in the course of litigating the question of claim construction? Not in his claim construction ruling because Marshall asked or sought leave to change the construction months after the record had closed, and the court denied that. Okay, so the court actually had an order denying leave to change. Absolutely, right. So as it stood, Marshall's construction was adopted requiring geographic impossibility. The district court also correctly construed the switching computer means limitation controlling said switch processor to require permanent anti-blocking. And if the court upholds that construction, U.S. South could not be liable for infringement on any claim except for Claim 17 of the 636 patent. Just to follow up one more time with Bill's thing, just start with Judge Bryson's question. Just to be clear, they moved while Discovery was still open to change the claim construction, correct? Discovery was open. Summary judgment record closed for several months. Oh, and the claim construction record had closed. I believe the hearing happened in early January. They moved in March. The switching computer means limitation requiring permanent anti-blocking. If you look at Column 6, Line 63, it says first PC-32, that's the switching computer, checks to see if the caller's pin matches a valid pin, and then it describes what happens if it doesn't. Picking up on Line 7, sorry, Column 7, Line 4, if two additional invalid calls are attempted from the same telephone as indicated by the ante within a predetermined period of time, then the switching station personal computer 32 instructs the DCS switch 22 to permanently block all future call attempts from that number. There's just no other way to interpret that passage other than requiring permanent anti-blocking. Now, Marshall correctly notes that there are other situations in the patent that talk about simply disconnecting or disallowing the call. So things like insufficient funds or unauthorized international calls, you're going to get a disconnection, not a permanent block. But none of those instances involve what we're talking about here, which is entering multiple invalid pins. And in that instances, there is only one way to interpret the patent, which is to require permanent anti-blocking. Thank you very much. No questions? OK. Thank you, Mr. McGrath. Judge Moore, I did want to correct a misstatement. We do believe that the switching computer means are the personal computers 32 and 33, as the court found in A9. For some reason, I was responding to your question about what was in the first paragraph of Claim 1, the switching station, including a switch processor, et cetera. That was my mistake. The switch processor is not part of the switching computer means? Right. It's just the personal computers 32 and 33. Just a couple points. On the GI test, there are, as when you view the specification through the prism of a person of ordinary skill in the art, as you must here, the declarations from those people at A331 and A445 show that there are certain steps that should and must be performed. You have to receive call data, the ANI and the PIN, and also the time of origination of the call. You have to authenticate that data. You have to authenticate the destination number. You have to check the travel card balance. You have to do all this during the pending call. The district court found that these were part of the SCM algorithm. They're sufficient to get over the—to make a definite under the legal standard. On the permanent block, just very quickly— Let me make sure I understood what you just said. Are you saying that identification of the PIN as a valid PIN is a necessary step in the claims? I am. But not geographic impossibility determination. That's correct. And the reason I say that, Your Honor, is because the identification of the PIN as a valid PIN is reiterated several times in the summary of the invention as being important. In particular, column three, lines 21 to 23, A72, it talks about validating the account number in the PIN. And it was clear to persons of ordinary skill and the art reading that that those are required steps contextually. Regarding the permanent block, that's not dispositive on this appeal because all parties— U.S. South and the district court agreed that 636 claim 17 isn't part—doesn't have a permanent block requirement because it recites a different function. But it's important to recognize that there are several disclosures in the specification of repeated failed PIN attempts that don't require a permanent block. For example, if Your Honor is looking at claims 5 and 7 of the 636 patent, which form a part of the original disclosure of the specification, those claims show that the dual PIN test does not require a permanent block. They don't say anything about a permanent block. And the experts relied on those—on claim 7 at A331 and A445 at step 2. So this is not a new argument. This was in our expert declarations. Under Dossal, In re Dossal, and under Atmel, and under Bio Medino, we have to look at the specification through the prism of what those of ordinary skill see. The district court never made any reference, in its opinion, to what our persons of ordinary skill said. And we respectfully suggest that was erroneous. Thank you. Thank you, Mr. Mouser and Ms. McGrath. Thank you. The case is taken under submission.